Gladys Laverne REED, Plaintiff-Respondent,

v.

Alec Richard SHELLY, Defendant-Appellant.

No. 8227.

Springfield Court of Appeals

Missouri.

April 7, 1964.

Modified on Court's Own Motion, Motion for Rehearing or for Transfer to Supreme Court Denied May 12, 1964.

Harold D. Jones, Bock & Jones, New Madrid, James F. Ford, Ford, Ford & Crow, Kennett, for defendant-appellant.

William H. Billings, Flake L. McHaney, McHaney, Billings & Welman, Kennett, for plaintiff-respondent.

HOGAN, Judge.

This action was brought by the plaintiff to recover damages for personal injuries sustained in an automobile collision. A jury found for the plaintiff and assessed her damages in the sum of $8,000. The defendant has appealed.

The collision occurred on Missouri Highway No. 84 about a mile and a half west of Hayti, Missouri, on July 15, 1959, at about 9:30 P.M. At the place in question, Highway 84 runs east and west and is a two-lane blacktop road, 24 feet wide, marked with a center line. Photographs of the scene received in evidence indicate that the highway is straight and level in that vicinity. On the south side of the highway, either at or very near the point of impact, the defendant's driveway intersects the highway on the south. Beyond this driveway, to the west, there is a ditch about four feet deep on the south side of the road. At the time of the accident, it was fair and dark, and the road was dry.

The defendant, at the time of the accident, was driving west on Highway 84, "carrying [his daughter] home" from choir practice. Although the evidence is in sharp conflict as to the position of the defendant's vehicle relative to the center line, it is apparent that he stopped about even with the east edge of the driveway, "fixing to turn in." The plaintiff's vehicle, being driven by her husband and in which she was riding as a passenger, was also approaching from the east on the same (north) side of the road. The collision occurred when the plaintiff's driver attempted to pass the defendant on the left, or south, side of the

highway. As a result of the collision, the plaintiff's car went into the ditch on the south side, traveled a considerable distance, and struck another driveway on the same side of the road. The plaintiff was thrown against the dashboard and sustained severe injuries.

The plaintiff, who was about 33 years old when she was injured, was on her way to visit members of her husband's family at Kennett, Missouri, a short distance from the place in question. She remembered practically nothing about the collision itself. She testified that she remembered leaving the road, but she had no recollection of the movements of either vehicle just before they collided, as she had "put [her] head back and was dozing," and remembered only "coming to * * * way down in the [front] seat, slumped over."

The plaintiff's husband, who was driving her vehicle on the occasion in question, was her principal witness to the facts of the accident. Mr. Reed was driving west on Highway 84, traveling at a moderate rate of speed, when he saw the Shelly vehicle some distance ahead (although the precise distance is not clear) with the "right light" apparently blinking. Reed then diminished his speed slightly and continued to approach the Shelly car, which, according to Reed, "swung right" so that the Shelly automobile "looked like he swung all the way off [the highway]" to the right. Reed was then 150 to 175 feet to the rear of Shelly. Reed then turned into the south lane, increased his speed to about 35 to 45 miles per hour, and started to pass the defendant on the left. Reed admittedly gave no signal of his intention to pass at any time and, after he began the passing maneuver, lost sight of the defendant completely until he had come within "about twelve feet" of the rear of the Shelly vehicle. According to Reed's testimony, the defendant then began bearing to the left (south) into the passing lane, "and when I [Reed] seen him coming at me I swerved to the left, and he [defendant] kept coming, and I'd say the collision occurred from about three to four

feet over in the passing lane, and I went off into the ditch." Reed was emphatic in his testimony that he saw no oncoming traffic at any time.

The defendant's testimony was sharply at variance with Reed's in several particulars. According to Mr. Shelly, he drove west until his car was about even with the east edge of the driveway, and stopped completely, preparing to turn left into the driveway. Mr. Shelly had, as he recalled, turned his "left signal on" about 300 yards east of the driveway, and had come to a standstill with his car completely on the right side of the road. Approaching from the west was a trailer truck, some 250 to 350 feet to the west, going approximately 40 miles per hour. Mr. Shelly had seen Reed in his rear view mirror, but he was "pretty far back" "apparently a quarter of a mile back." According to Shelly—at least as we understand his testimony—Reed attempted to pass from the rear almost at the same time the approaching truck was passing, "so he [Reed] kind of wedged between me and the truck, I don't think he hit the truck, but he just tipped me a little bit, he didn't hit me hard." Mr. Shelly denied that he had ever turned to the right before commencing his left turn, and vigorously denied that he had moved any portion of his vehicle into the south (eastbound) lane before the collision; it was Shelly's testimony that he had not begun the left turn because he "wasn't going in [the driveway] because I could see him [Reed] back there, I could see that car in back of me, I didn't make no effort to go in. * * *" The defendant's testimony was generally corroborated by his daughter, who had been a passenger in his vehicle at the time.

In rebuttal, the plaintiff introduced the evidence of a highway patrolman who testified that he had found dirt "apparently from the impact" on the south side of the highway, one to two feet across the center line, and she also introduced evidence of a statement made earlier by the defendant in which Shelly said that he had turned left, or had started to do so, in order to allow Reed to continue in the north lane, when the collision occurred. Other evidence will be noted as necessary in the course of the opinion.

■ Numerous assignments of error have been briefed and developed in argument here by the defendant. For the sake of a reasonably clear and succinct opinion, we are going to consider some of his contentions together. One of the defendant's first points for consideration is his argument that Reed's testimony is so "improbable and unbelievable" that it should not be considered as substantial evidence. This point need not detain us long. Our appellate courts have, on occasion, said that they can disregard testimony upon a material issue when the testimony is contrary to known physical laws or inherently impossible, but they have also qualified this statement by saying that they will do so only where the inherent impossibility is so obvious that reasonable minds could not differ. Steffen v. Ritter, Mo., 214 S.W.2d 28, 29 [1, 2]; Davis v. F. M. Stamper Co., 347 Mo. 761, 770, 148 S.W.2d 765, 769 [6-8]; Dempsey v. Horton, 337 Mo. 379, 384, 84 S.W.2d 621, 624 [5, 6]. We believe there is no reason, apparent on this record, to reject Mr. Reed's testimony as being inherently impossible or incredible. Rather, it appears to us to be entirely consonant with known physical laws and common experience. The credibility of the plaintiff's evidence was simply a matter for the jury's consideration.

■ The defendant further attacks the submissibility of plaintiff's case by saying there is no substantial evidence that the defendant had notice of Reed's intention to pass in time to avoid the collision. It is argued that Shelly had a right to turn left until he had actual or constructive notice of Reed's impending attempt to pass, and that he had a right to assume that Reed would not pass without giving an audible signal. Therefore, the defendant maintains, since Reed began to pass when he was 150 feet to the rear of the Shelly vehicle, going

about 35 miles per hour, and admittedly gave no warning of his approach, the defendant would have had only one or two seconds' notice of the impending collision, and this was insufficient to allow the defendant to take any action to avoid the casualty. It is not seriously contended that Mrs. Reed was guilty of contributory negligence as a matter of law, nor that there is any reason to impute the negligence of the driver to Mrs. Reed. The defendant's argument is simply that, in the circumstances, Shelly was not negligent.

We believe the defendant's argument applies the rules of the road to this situation in too positive and dogmatic a vein. These rules do not confer absolute rights, but rather impose reciprocal obligations which are qualified by the circumstances.[1] Basically, it is the duty of the overtaking vehicle—in this case, Reed—to "sound [his] horn before starting to pass," Section 304.016, par. 1, subpar. 1,[2] and Shelly, in making his left turn, was governed by Section 304.019, which provides in part that: "No person shall * * * move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal * * *." Even though in this case the driver who was overtaking and passing admitted that he gave no warning of his intention to pass, we consider it somewhat misleading to define the duties of a motorist in terms of what he may take for granted. If, in this case, Shelly was aware of Reed's presence on the highway behind him and had a duty to make some observation to the rear, we consider it inaccurate to say that he had a *right* to turn left. As we understand it, a motorist may not take for granted or assume that other vehicles will not be on the highway in violation of the rules of the

road and thus dispense with his duty to maintain a careful watch for other vehicles or persons using the highway, provided there is any duty to keep a lookout in the first place. Pitts v. Garner, Mo., 321 S.W. 2d 509, 517–518; Faught v. Washam, 365 Mo. 1021, 1028–1030, 291 S.W.2d 78, 82–83. In the case at hand, the question is whether Shelly was required to look first for overtaking vehicles, or could assume that none were behind until he heard a signal. The statute itself partially answers the question. Section 304.019 prohibits a left turn " * * unless and until such movement can be made with reasonable safety * * *." There is also a partial answer in the case of Myers v. Searcy, Mo., 356 S.W.2d 59, upon which the respondent relies heavily. In the Myers case, the Supreme Court was considering the contributory negligence of a plaintiff turning left at an intersection when he was struck by the defendant who was passing on the left in violation of Section 304.016, par. 4, subpar. 2, which prohibits driving to the left within 100 feet of an intersection. The court held that it was Myers' duty to keep a lookout for the vehicle attempting to pass on the left "under the circumstances here shown. * * *" Myers v. Searcy, supra, 356 S.W.2d at 62–63 [4–8]. We have concluded that even though the opening paragraph of Section 304.019 does not mention a "lookout," and Myers v. Searcy may be technically distinguishable from the case at bar, still a driver who intends to turn left must make a proper observation to the rear to ascertain whether another vehicle is approaching from the rear in such close proximity that a left turn cannot be made with reasonable safety. The language of the opening paragraph of Section 304.019 and cases construing similar statutes convince us that at least two duties are imposed upon a motorist who intends to turn left in the

1. Garrison v. Ryno, Mo., 328 S.W.2d 557, 565–66; Nelms v. Bright, Mo., 299 S.W. 2d 483, 490; McGuire v. Steel Transp. Co., Inc., 359 Mo. 1179, 1184, 225 S.W. 2d 699, 702; Wines v. Goodyear Tire & Rubber Co., Mo.App., 246 S.W.2d 525, 528 [1–3].

2. All references to statutes and rules are to RSMo (1959), V.A.M.S. and V.A.M.R., unless otherwise noted.

circumstances here presented. First, he must ascertain that such movement can be made with reasonable safety; then, he must give an appropriate signal of his intention to change direction. Giving a signal does not dispense with the necessity of determining that a left turn can be made with reasonable safety.[3] Further, an integral part of the statutory obligation to ascertain that a left turn can be made with reasonable safety is the duty to make an appropriate observation to the rear for overtaking vehicles.[4] Section 304.019 does not, in our view, prohibit a left turn unless the circumstances are absolutely free from danger, nor does it require the maintenance of a continuous observation to the rear prior to or during the making of a left turn. We do not believe the use of the word "lookout" in Instruction P.-2 was sufficiently prejudicial to require reversal in this particular case, as the defendant maintains, for a lookout, in one sense, merely means a careful looking or watching for any object. Valdin v. Holteen, supra, n. 4, 260 P.2d at 513. We will plainly say, however, that we think the use of the phrase "keep a lookout" is misleading in defining the obligations imposed by the opening paragraph of Section 304.-019; the phrase "keep a lookout" implies or connotes the driver's continuous statutory duty to maintain a vigilant lookout ahead and laterally in the direction he is traveling. What we say here is that the driver of a motor vehicle is required to exercise the highest degree of care at all times, Section 304.010, par. 1, and it follows that a driver must use the highest degree of care to ascertain that his turn can be made with reasonable safety. One of the things he must do in determining that the movement can be made with safety is to make such observation of overtaking traffic as comports with the highest degree of care. The duty of a motorist intending to turn left would be better defined in such terms, and not in terms of "keeping a lookout."

 Applying what we have said to the facts of this case, we believe the inference was permissible that Shelly was in fact negligent. Both parties agree that the plaintiff is entitled to the most favorable construction of the evidence in determining whether she made a submissible case, Le Neve v. Rankin, Mo.App., 341 S.W.2d 358, 362 [2], and, in this light, reasonable minds could have concluded: That as Reed was going west at a moderate rate of speed, 40 to 50 miles per hour, he saw Shelly ahead of him, some distance away, beginning a driving maneuver which would take him to the north or right, apparently entirely off the roadway. According to Reed, it appeared that "he swung all the way off * * * to the right. * * *" Acting upon this appearance, Reed, then 100 to 150 feet to the rear (east) of Shelly's car, turned into the south lane, accelerated his speed slightly "to between 35 and 45," and temporarily lost sight of the vehicle ahead. When Reed had come within twelve feet of the Shelly vehicle, the defendant started turning left, and when Reed "noticed he was coming back towards me * * *" Reed swerved to the left but was unable to avoid Shelly; the two vehicles collided three or four feet over in the passing lane. Of course, Reed's statement that he lost sight of the vehicle indicates a certain inatten-

3. Kudirka v. Fairman, M.D.Pa., 152 F. Supp. 120, 122–123 [3]; Kentucky Bus Lines v. Wilson, Ky., 258 S.W.2d 486, 488 [4]; Service Fire Ins. Co. of N. Y. v. Suezy, La.App., 77 So.2d 110, 112; Kruger v. Ervin Clark Constr. Co., 166 Neb. 252, 88 N.W.2d 778, 781–782; Ervin v. Cannon Mills Co., 233 N.C. 415, 64 S.E.2d 431, 435–436 [9]; Smith v. Clark, 187 Va. 181, 46 S.E.2d 21, 24 [2].

4. Crouse v. United States, D.C.Del., 137 F.Supp. 47, 50 [7–9]; Clayton v. Mc-

Ilrath, 241 Iowa 1162, 44 N.W.2d 741, 746 [12, 13] [14], 27 A.L.R.2d 307; Auckley v. Robbins, La.App., 45 So.2d 380, 381–82 [1]; Jacoby v. Schafsnitz, 270 Mich. 515, 259 N.W. 322 [1, 2]; Tart v. Register, 257 N.C. 161, 125 S.E. 2d 754, 759 [12, 13]; Valdin v. Holteen, 199 Or. 134, 260 P.2d 504, 513 [14] [15]; Kincaide v. Hardware Mut. Cas. Co., 15 Wis.2d 474, 113 N.W.2d 147, 149 [3, 4]; 1 Blashfield, Cyclopedia of Automobile Law and Practice, § 685, p. 580.

tiveness on his part, but in considering Shelly's negligence, or lack of it, the jury could reasonbly have found that he was not only aware of the overtaking vehicle but that he appreciated some possibility of danger, for the defendant did testify on one occasion that he watched Reed in the rear view mirror as the truck was coming by (according to Shelly, from the opposite direction) and that he "saw him [Reed] coming. * * *" And, referring to the driveway on the south, Shelly testified that "I wasn't going in because I could see him back there, I could see the car in back of me, I didn't make no effort to go in. * *" Put very bluntly, though Shelly was, in this situation, under no obligation to keep his eyes glued to the rear to determine that he could safely turn, neither had he the right to proceed obliviously into the passing lane upon the assumption that no one would be there. There is considerable force in the defendant's argument that he had but a short time in which to appreciate Reed's intention, but he was aware of the presence of the overtaking vehicle and a jury might have concluded that another glance in the mirror or to the rear was required to conform to the highest degree of care. It is our view that a jury could reasonably have concluded that Shelly negligently failed to ascertain that his left turn could be made with reasonable safety and that the plaintiff made a submissible case.

■ The defendant next makes · six specific assignments of error directed to Instruction P–2, which was the plaintiff's verdict-directing instruction. Some of these assignments—for example, that there was no substantial evidence of any negligence upon which to base an instruction, that the instruction did not recognize the defendant's right to turn left, and that the instruction erroneously defined the defendant's duty to the plaintiff—have been disposed of by what we have already said. The instruction complained of, in an opening paragraph, hypothesized the plaintiff's presence on the highway in her husband's vehicle, required a finding that Reed drove into the south lane and attempted to pass the defendant, that Shelly then turned left to go into a driveway and collided with Reed, and that as a direct result Mrs. Reed was injured. In the second paragraph, the instruction advised the jury that it was the defendant's duty to keep a lookout to avoid turning into the path of other vehicles. The jury was then instructed that if they found that the defendant, by the exercise of the highest degree of care, could have seen the Reed automobile approaching and passing in time to have avoided the collision but that the defendant failed to do so, and if they found that the defendant negligently turned his automobile from a direct course to the left into Reed's path when he knew, or in the highest degree of care should have known, that a collision was likely to occur, and that the defendant's negligence caused or contributed to cause the collision and Mrs. Reed's injuries, then their verdict would be for the plaintiff.

The defendant assigns error to the failure of this instruction to require a finding that Shelly could have determined that Reed intended to pass. This contention overlooks the clear inference from Shelly's testimony, which we have noted, that he had some appreciation of possible danger from the overtaking vehicle. There was no requirement, at least in the peculiar circumstances of this case, that the defendant have any particular time in which to act or take some evasive action. All the defendant was required to do, to avert a collision, was to remain stationary. As to the defendant's more detailed objections to Instruction P–2, we agree that it is clumsily constructed and, in the event of a retrial of this case, plaintiff's counsel would be well advised to consider the defendant's objections and redraft the instruction. At least for the reasons briefed and argued here, however, we do not believe that Instruction P–2 was so prejudicially erroneous as to require reversal. See Schmidt v. Windish, Mo., 304 S.W.2d 891, 895.

The defendant contends that plaintiff's Instruction P–4 was prejudicially errone-

ous. This instruction first advised the jury in substance that if plaintiff was a passenger in her husband's vehicle and had nothing to do with the driving or control of the vehicle, then the negligence, if any, of the driver would not be imputable or chargeable to the plaintiff. The instruction then continued:

"You are further instructed that with reference to the charges of negligence against the defendant in this case, that if from the evidence and these instructions of the court you find the defendant was negligent as submitted in the other instructions, and the negligence, if any, of the defendant, *no matter how great,* and the negligence, if any, of Roy Reed, *no matter how great,* directly concurred, combined and *contributed in any degree* to cause plaintiff Gladys Reed to sustain injury, if so, and if you find that plaintiff was in the exercise of ordinary care for her own safety, *then it would be your duty to return a verdict in favor of Gladys Reed* and against defendant because if you find that the defendant was negligent as submitted to you in these instructions, and if his negligence directly contributed to cause injury, if any, to the plaintiff, then the defendant, *even if less negligent than Roy Reed,* could not make use of the concurring negligence of plaintiff's husband to defeat the claim of the plaintiff against the defendant." (Emphasis ours)

Defendant assails this instruction by saying that the first paragraph "comments on the evidence, exonerates plaintiff under facts not in issue, gives undue weight to plaintiff's case, and lectures the jury on acts of plaintiff's husband." As to the second paragraph, the defendant maintains that it conflicts with his sole cause instruction and positively misdirects the jury on the question of proximate cause. The defendant cites the cases of Rothweiler v. St. Louis Pub. Serv. Co., 361 Mo. 259, 234 S.W.2d 552, and Danner v. Weinreich, Mo., 323 S.W.2d 746, as authority. We have given this assignment of error the most careful consideration and have concluded that there was prejudicial error in giving the instruc-

tion. We are aware that instructions similar to Instruction P–4 have provoked considerable controversy, and in order to state our conclusion explicitly, we must briefly place the parties' factual theories in apposition.

By the plaintiff's evidence, as Mr. Reed drove his vehicle west along the highway, he saw the defendant some distance ahead. During the course of his testimony, he said on several occasions that it was 200 feet ahead, and on several others that it was 200 yards ahead. Mr. Shelly appeared to be turning right, off the road. Mr. Reed slackened his speed, and then lost sight of the defendant—"didn't see his car no more until [I] got up in about twelve feet of him." Reed gave no signal before starting to pass; he neither blinked his lights nor sounded his horn at any time. Mr. Reed moved into the passing (south) lane when he was about 150 feet to Shelly's rear, and when he came up to within twelve feet of the Shelly automobile, the defendant began to make a left turn; Reed still did not signal but "swerved to the left," or "began to lead off to the left." The defendant's "left bumper" came in contact with Reed's "right fender," and Reed went into the ditch on the south side of the highway. Reed did not stop then, however. He "couldn't find the brake * * * and kept hitting the accelerator, that's what I figured, so I kept rolling for 500 to 600 feet * * * and then I hit another embankment, and that's when my car * * * stopped." Precisely, it was shown that after the collision Reed traveled 525 feet west in the ditch and was stopped when he struck another driveway on the south side of the road. Mrs. Reed, the plaintiff, was asleep, did not see the accident, and seems not to have been fully awakened by the collision with the Shelly vehicle. As we read the record, it is fairly inferable that she sustained her injuries when the Reed vehicle struck the driveway some 525 feet on to the west. It also could be fairly inferred, we think, that the impact itself was very slight. Photographs of the damaged vehicles were introduced in evi-

dence, and while the Reed vehicle is the most extensively damaged, most of that damage was referable to its collision with the embankment, or driveway, which it struck after colliding with Shelly. Mr. Shelly's automobile shows only very slight damage to the left front fender.

' The defendant's evidence was that he had stopped, completely on the north side of the highway, preparatory to making a left turn. He had seen the Reed vehicle approaching from the rear, some 300 feet behind him when he stopped. There was a trailer truck coming from the west, and the defendant stopped "to let him by." Just as the truck passed, according to Mr. Shelly, the Reed car passed from the rear, barely missing the truck, and "tipping" the Shelly automobile "a little bit," and then "taken the ditch." Mr. Shelly "might have moved a little" after the truck passed, but he denied that he was in the south lane when the collision occurred.

 Now, even though Reed's negligence, if any, could not be imputed to the plaintiff and plaintiff was guilty of no contributory negligence, the defendant was still entitled to have the jury consider the other side of the coin, so to speak, and absolve him of liability if plaintiff's injuries were wholly and alone due to Reed's negligent act—in other words, through a sole cause submission, if the evidence supported it. Gower v. Trumbo, Mo., 181 S.W.2d 653, 655 [1–4]; Semar v. Kelly, 352 Mo. 157, 162, 176 S.W.2d 289, 291 [2, 3]; Vincent v. Raffety, Mo.App., 344 S.W.2d 293, 296 [4]. By current authority, the sole cause submission " * * * concedes that the injuries to plaintiff resulted from the negligence of someone, and * * * authorizes a finding * * * for the defendant only if [the jury] finds that the negligence of the plaintiff, or someone other than the defendant, was the sole proximate cause of the injuries * * *." Hall v. Rager, Mo., 357 S.W.2d 83, 88; Happy v. Blanton, Mo., 303 S.W.2d 633, 637 [3–6]. If we look to the evidence, and the reasonable inferences favorable to the defendant, Hopkins v. Highland Dairy Farms Co., 348 Mo. 1158, 1160, 159 S.W.2d 254, 255 [1], we believe the evidence supported a sole cause submission. As we have indicated, there is considerable force in the defendant's argument that he did not have sufficient indication of Reed's impending pass to advise him that a left turn could not be made with reasonable safety, and a jury might reasonably have concluded that Shelly divided his attention between Reed and the oncoming truck as well as he could, and had, in this respect, exercised the highest degree of care, even if he was turning left at the time of collision. We are of the further opinion that Reed could have been considered negligent in failing to keep the automobile ahead in view, in failing to give any warning of his intention to pass, and in continuing to accelerate down the ditch for 525 feet after the collision occurred. Further, the evidence would justify the conclusion that the impact between the Reed and Shelly automobiles was so slight that it did not contribute substantially to the plaintiff's injuries. We do not, of course, say that the evidence forced any such conclusions; we merely say that they are reasonable from the point of view of defendant's evidence, and all reasonable inferences favorable to him.

 The defendant did submit the issue of sole cause by his Instruction D–1, which in effect told the jury that if it found Reed failed to exercise the highest degree of care in certain specified respects, that such negligence was the sole cause of the collision, and that Shelly was not negligent as submitted in the other instructions, then its verdict would be for the defendant. We do not reach nor decide the sufficiency of the defendant's hypothesis of facts in his sole cause instruction, but we note that it is no longer considered necessary for a sole cause instruction to inform the jury specifically in a guest case that the negligence of the driver cannot be imputed to the passenger, McGhee v. Jones, Mo., 336 S.W.2d 722, 726 [1, 2]; Clemons v. Becker, Mo., 283 S.W.2d 449, 452 [7]; and defendant's

required finding that Shelly "was not negligent as submitted to you in the other instructions" sufficiently negatived the possibility of concurring negligence on Shelly's part. Happy v. Blanton, supra, 303 S.W.2d at 639 [11, 12]. Thus, Instruction P–4 was unnecessary for the jury's guidance, and the jury would not have been misdirected had the plaintiff given no instruction on these subjects.

It is true that the defendant pleaded a joint venture or joint enterprise, but adduced no evidence tending to establish it; and since there was no evidence tending to establish it, and since there was no evidence that the plaintiff was a joint owner or otherwise exercised any right or control over the vehicle, her husband's contributory negligence would not bar her recovery. Pence v. Kansas City Laundry Service Co., 332 Mo. 930, 939, 59 S.W.2d 633, 636 [8, 9]; Le Neve v. Rankin, supra, 341 S.W.2d at 363–64; Greenwood v. Bridgeways, Inc., Mo.App., 243 S.W.2d at 111, 115 [12]. The first paragraph of Instruction P–4 possibly had a tendency to emphasize a matter which was not under consideration, but it did declare the law correctly as far as it went, and we can see nothing prejudicially erroneous in this first paragraph.

It is the second paragraph of the instruction which is, in our view, erroneous. In the circumstances of this case, it simply constitutes an unnecessary argument to the jury and, as the defendant claims, actually nullifies his attempted sole cause submission. We cannot agree with the plaintiff that repeated use of the phrase "no matter how great," and of the phrase "even if less negligent," in comparing and contrasting the acts of Reed and Shelly has been "approved." There are many cases which have held on an ad hoc basis that the use of such language was not prejudicial, but on broad principles negligence is not susceptible to division into degrees, 38 Am.Jur., Negligence, § 43, pp. 688–89; see 2 Harper & James, Torts, § 16.13, pp.

945–47, and the doctrine of comparative negligence has been rejected in this State. Howard v. Scarritt Estate Co., 267 Mo. 398, 402, 184 S.W. 1144, 1145 [2]. In the case of Rothweiler v. St. Louis Pub. Serv. Co., supra, 234 S.W.2d at 555, the Supreme Court "t[ook] occasion to say that no useful or fair purpose is served by the two references * * * to the negligence of defendant *no matter how great.'* * * *"* Instructions which recognize or submit comparison of degrees of negligence or causal connection are generally subject to criticism, State ex rel. Kansas City Public Serv. Co. v. Bland, 353 Mo. 1234, 1242–1243, 187 S.W.2d 211, 214–15 [7]; Kunz v. Munzlinger, Mo., 242 S.W.2d 536, 541; Anno., 87 A.L.R.2d 1391, 1395–97, and Instruction P–4, in our view, plainly implies that the jury should apply one standard of conduct to Shelly, and another, less onerous, standard to Reed. In this respect, the instruction is erroneous, and unfair to Shelly. The real vice of Instruction P–4 is, however, that it clouds and obscures the essential element and required finding of proximate cause, upon which a plaintiff's verdict should have been predicated, by advising the jury that it was their *duty* to find for the plaintiff if Shelly's negligence contributed "in any degree." Waldrip v. American Buslines, Inc., Mo., 327 S.W.2d 211, 217; Danner v. Weinreich, supra, 323 S.W.2d at 750–752. We are aware that the Danner case deals specifically with contributory negligence, but even concurrent negligence must be an efficient producing cause of the injury, to be actionable, even though it need not be the sole proximate cause. Fawkes v. National Refining Co., 341 Mo. 630, 639–640, 108 S.W.2d 7, 11–12 [11–15]; King v. Rieth, 341 Mo. 467, 476–77, 108 S.W.2d 1, 5–6 [8–10]; Giles v. Moundridge Milling Co., 351 Mo. 568, 576–77, 173 S.W. 2d 745, 750–751 [6–8]; 38 Am.Jur., Negligence, § 64, pp. 718–19. We neither adhere to nor advance the idea that giving Instruction P–4 would be abstractly erroneous in all conceivable circumstances. See Brooks v. Mock, Mo., 330 S.W.2d 759, 767–768 [12]. We are of the view, however, that no

amount of gloss can obscure the fact that Instruction P–4 unfairly invited a comparison of the conduct of Reed and Shelly in terms of relative fault by classifying negligence according to degree, and prejudicially favored the plaintiff by weakening or modifying the requirement that Shelly's negligence be a direct and proximate cause of plaintiff's injuries. For these reasons, the giving of Instruction P–4 was prejudicial error, upon the record presented. Danner v. Weinreich, supra, 323 S.W.2d at 751–52; Waldrip v. American Buslines, Inc., supra, 327 S.W.2d at 217 [5]. See also Frank v. Stiegler, 250 Minn. 447, 84 N.W.2d 912, 918 [9].

The defendant has made numerous additional assignments of error. In some of these assignments, we think there may be some substantial merit, but since they concern matters which might not be involved in the event of retrial, we consider it inappropriate to deal with these additional claims of error. There is one final point which must be discussed, however.

█ As part of her case, presumably to show the nature and extent of her injuries, the plaintiff introduced a colored photograph of herself in evidence. The picture is 8 inches by 10 inches and shows the plaintiff reclining in a hospital bed, clad in an ordinary hospital gown. There are some bruised areas about her face, a small piece of adhesive tape across the bridge of her nose, and she appears to have two black eyes. There is no visible break in the skin, nor is there any expression of pain on her face.

Before this exhibit—Plaintiff's Exhibit C—was admitted in evidence, the trial court conducted a preliminary inquiry to ascertain how and where the picture had been taken, and whether it accurately portrayed the plaintiff's condition at the time it was taken. The evidence disclosed that the photograph had been taken by Mr. Billings, one of the attorneys for the plaintiff. Mr. Billings is an experienced photographer who was, for several years prior to his entry into the legal profession, employed as a photographer by a local newspaper. During the course of his employment as a newspaper photographer, he took pictures, developed pictures, and processed and enlarged pictures. He has, on occasion, taken pictures for use by various national news services. Mr. Billings testified that he took the picture some four days after the plaintiff sustained her injuries, while she was a patient in the Hayti Memorial Hospital. Mr. Billings described in some detail the technique which he had used in making the picture. While the photograph may have been taken for use in litigation, it does not appear that it was specially posed so as to emphasize or exaggerate the plaintiff's injuries, and there is no indication that the photograph has been retouched or tinted.

Exhibit C was shown to Dr. Leo Benson, a physician who was attending the plaintiff at the time the photograph was made. Dr. Benson testified that there was no distortion of any of the colors of the plaintiff's face as it had appeared at the time, and stated that the colored photograph did not exaggerate the plaintiff's injuries. He was of the opinion that the picture was a "very accurate" representation of Mrs. Reed as she appeared at the time of his treatment. Upon this showing, the exhibit was admitted in evidence. The plaintiff also offered a black and white photograph for purposes of comparison. The defendant has vigorously objected to the admission of the colored photograph in evidence. Both in his brief and upon argument here, he maintains that the photograph was inflammatory and prejudicial. He cites Faught v. Washam, supra, 329 S.W.2d 588, as authority for his position.

█ We do not understand the Faught case to pronounce that colored photographs are anathema in the Missouri courts. After carefully considering the exhibits themselves in that case, and reviewing much authority, the court pointed out that the indiscriminate and flamboyant use of colored photographs as "visual aids" in the presentation of a case may re-

sult in prejudicial error, and went on to say that the appellate courts are not foreclosed by the exercise of the trial court's discretion in admitting such evidence. Faught v. Washam, supra, 329 S.W.2d at 599–600 [19] [20–22]. See also McCormick, Evidence, Sections 180–81, pp. 386–88. However, the Faught case also held that "there [was] no logical reason why colored photographs should not be used in evidence, subject to the same limitations and restrictions as black and white photographs," Faught v. Washam, supra, 329 S.W.2d at 599, and indeed, colored photographs seem to be commonly used in both civil and criminal actions.[5] Generally, it is said that colored photographs are admissible in evidence in personal injury actions to indicate the nature and extent of the injuries sustained, so long as they accurately portray and do not exaggerate the injuries. Faught v. Washam, supra, 329 S.W.2d at 599–600; Floen v. Sund, 255 Minn. 211, 96 N.W.2d 563, 568 [7]; Killary v. Burlington-Lake Champlain C. of C., Inc., 123 Vt. 256, 186 A.2d 170, 178 [12]. Before admitting a colored photograph in evidence, however, the court should ascertain by suitable preliminary inquiry that the photograph is sufficiently verified, that it reflects the situation fairly, and that it is likely to be of sufficient assistance to warrant its use, Horowitz v. Bokron, 337 Mass. 739, 151 N.E.2d 480, 483 [3–5]; Killary v. Burlington-Lake Champlain C. of C., Inc., supra, 186 A.2d at 178 [12], and so far as the admission or exclusion of a colored photograph is discretionary on the part of the trial court, the exercise of that discretion is subject to review. Faught v. Washam, supra, 329 S.W.2d at 600, and cases cited n.

20; Horowitz v. Bokron, supra, 151 N.E.2d at 483.

In this case, the photograph was taken by an experienced photographer, within three or four days of the accident. So far as we can judge, it is not gruesome, nor does it tend to exaggerate the plaintiff's injuries. The colors of the photograph are reasonably subdued. Plaintiff's attending physician testified that it was an accurate portrayal of the plaintiff's condition at the time he saw her, and that it accurately reflected the color of the tissues of plaintiff's face at that time.

We cannot agree with the defendant's facile argument that any jury would readily understand the nature and extent of plaintiff's injuries from the medical testimony. The medical evidence was that she had suffered "fractures of both maxillary bones * * * both zygomatic arches * * * the left nasal bone * * * and possibly the right. * * * *" There were apparently no gross external wounds, nor were any external incisions made to perform the two operations which plaintiff underwent. It is our view that the photograph communicates the nature and extent of plaintiff's injuries much more directly than the description of her injuries given by the physician. We find at least three fairly recent cases in which colored photographs have been admitted in reasonably similar circumstances,[6] and we conclude that there was no abuse of discretion in admitting plaintiff's Exhibit C.

For the reasons indicated, the judgment is reversed and the cause remanded.

RUARK, P. J., and STONE, J., concur.

5. See Faught v. Washam, supra, 329 S.W. 2d at 599, n. 18; Anno., 53 A.L.R.2d 1102; 2 A.L.R.2d Supp. Sv. 3292–93; 3 A.L.R.2d Supp. Sv. 1144; 4 A.L.R.2d Supp. Sv. 1201–02.

6. Horowitz v. Bokron, supra, 337 Mass. 739, 151 N.E.2d at 483 [3–5]; plaintiff injured in automobile accident; colored slides of injuries to her face and neck properly admitted. Floen v. Sund, supra, 255 Minn. 211, 96 N.W.2d at 568 [7]; plaintiff injured in automobile accident; colored photograph of plaintiff in hospital bed, scar over his forehead; picture taken for use in litigation; held, properly admitted. Killary v. Burlington-Lake Champlain C. of C., Inc., supra, 123 Vt. 256, 186 A.2d at 178 [12]; plaintiff injured in boating accident; colored slides taken by plastic surgeon showing plaintiff's progress in recovering from facial injuries; held, admissible.