**STATE of Missouri, ex rel. STATE HIGHWAY COMMISSION of Missouri, Plaintiff-Appellant,**

v.

**Bobby Roger HAYWOOD, Vickie Jean Sutfin and Querner Truck Lines, Inc., Defendants-Respondents.**

No. 12297.

Missouri Court of Appeals,
Southern District,
Division Three.

March 22, 1982.

Motion for Rehearing or to Transfer Denied April 15, 1982.

Application to Transfer Denied May 17, 1982.

Bruce A. Ring, Curtis F. Thompson, Jefferson City, for plaintiff-appellant.

James E. Whaley, Gary E. Snodgrass, Brown, James, Rabbitt, Whaley, McMullin & Pitzer, St. Louis, for defendants-respondents Bobby Roger Haywood and Querner Truck Lines.

Manuel Drumm, Drumm & Leible, Sikeston, for defendant-respondent Vickie Jean Sutfin.

FLANIGAN, Judge.

Between 11:30 p. m. and midnight on December 9, 1975, defendant Bobby Haywood was operating a tractor-trailer unit west on U. S. Highway 60 intending to enter and cross Bridge J-92. The bridge spans the St. Francis River near Fisk, Missouri. The highway is two-laned, one for eastbound and one for westbound traffic. During the crossing the tractor-trailer unit and the principal portion of the bridge, including its steel superstructure, fell into the river. The State of Missouri, through relator The State Highway Commission, brought this action against Haywood and two other defendants[1] seeking $211,592.26 for expenses allegedly incurred in repairing the bridge and in detouring traffic while the repairs were made.

The state's theory was that defendant Haywood negligently caused the tractor-trailer unit to collide with the "center span" of the bridge which in turn caused the bridge to collapse. It was the theory of the defendants that the tractor-trailer unit did not strike any portion of the bridge and that the collapse was due to some other cause "such as old age or structural defects." The jury found in favor of the defendants. The state appeals.

The state's first point is that the trial court erred in sustaining defendants' objections to four photographs, state's Exhibits 9, 10, 11 and 12. It is the state's position that the photographs were admissible, that they were of vital importance to the state's case and that the trial court committed reversible error in excluding them.

■ "[T]he admission or rejection of a photograph rests in the first instance in the trial court's discretion and its ruling will not be disturbed on appeal unless that discretion has been abused." *Long v. Hooker*, 443 S.W.2d 178, 181[3] (Mo.1969). The trial court's discretion is "wide," *State ex rel. State Highway Commission v. Lynch*, 471 S.W.2d 261, 267 (Mo.1971), but not unbridled. *Faught v. Washam*, 329 S.W.2d 588, 600[21] (Mo.1959); *Reed v. Shelly*, 378 S.W.2d 291, 303[26] (Mo.App.1964). It is error for the trial court to exclude photographs which are "*material* and *competent* evidence." *Dudeck v. Ellis*, 399 S.W.2d 80, 96 (Mo.1966). (Emphasis in original.) For the error to be reversible the appellate court must find that its commission by the trial court materially affected the merits of the action. Rule 84.13(b) V.A.M.R. Although affirmances of trial courts' rulings on the admissibility of photographs probably outnumber reversals, on occasion the appellate court does find an abuse of discretion in excluding photographs. See, for example, *Davis v. Illinois Terminal Railroad Company*, 307 S.W.2d 395 (Mo.1957).

"The general rule concerning the admission in evidence of a photograph is that the party offering it must show by extrinsic evidence that the photograph is an accurate

---

1. The other two defendants were the owner of the tractor-trailer unit and the lessee of it. Each was sued as the alleged employer of Haywood. Neither of those defendants, as respondents here, challenges the sufficiency of the state's evidence on the employment issue.

and faithful representation of the place, person or subject it purports to portray. This authenticity may be established by any witness who is familiar with the scene, object or person portrayed and is competent to speak from personal observation. * * * If a photograph correctly shows the situation and surroundings as far as it purports to show them, it should not be excluded because it does not show all the detailed facts and surroundings. * * * In addition, the fact alone that a photograph of a location or an object was taken before or after an event, and before or after changes have occurred, does not make the photograph inadmissible in evidence if the extent of the changes is explained. * * * When those changes are explained, and the photographs reasonably may aid the jury in arriving at an understanding of a fact or facts that have a direct bearing upon the issues, they are admissible in evidence. * * * These points of differences between what the photograph shows and what is contended to be the actual facts may be made the basis for cross-examination, thus enabling the jury to give proper weight to the evidence." *State v. Eilers*, 406 S.W.2d 567, 570–571 (Mo. 1966). (Authorities omitted.)

■ It is not necessary that the photographer's identity be made known or that he testify so long as a competent and knowledgeable witness furnishes a sufficient identification. *State v. Sanders*, 365 S.W.2d 480, 482 (Mo.1963); *Stogsdill v. General Am. Life Ins. Co.*, 541 S.W.2d 696, 701[16] (Mo.App.1976).

■ Before the photographs and their purported foundation are reviewed, some of the factual background must be set forth. The state introduced into evidence a model of the bridge. Its "center span," the portion which stood directly above the river, included a superstructure, a large metal framework. The bridge, and Highway 60 which crossed it, ran east and west. · A curb ran east and west on both sides of the highway. In the north curb was set a fence, the top of which, according to unchallenged photographs, was about three feet above the road surface. The fence consisted of two rails, the lower rail being approximately midway between the top rail and the top of the curb.

Of special significance here is the fence, or railing, located on the north side of the highway and east of the center span. This railing was 73½ feet long. It will be referred to as "the northeast railing."

On the night of December 9, 1975, two accidents took place on Bridge J–92 about four hours apart. Both accidents were immediately investigated by Corporal Charles Sisk of the Missouri Highway Patrol, who was the state's principal witness. The first accident occurred at approximately 7:45 p.m. and involved a tractor-trailer unit operated by one Robbins. Robbins was proceeding west and his unit struck an eastbound pizza truck. This collision occurred "on the west end of the bridge." In the Robbins accident there was some damage to the bridge railing "on the west end on the north side of the highway"—the railing west of the center span.

Following the Robbins accident Corporal Sisk inspected the center span and it was undamaged. At that time he also inspected the northeast railing and it was intact and undamaged. Also undamaged were seven "hazard boards" located on the north side of the highway immediately east of the east end of the northeast railing. These hazard boards were vertical warning signs, painted diagonally, sitting on steel poles which were set in the ground immediately east of the east end of the north curb. These hazard boards will be referred to as the "northeast hazard boards." Following the Robbins accident the bridge was still useable.

At approximately 11:30 p. m. defendant Bobby Haywood was driving his tractor-trailer unit, "with a 71,000 pound load," west on Highway 60 approaching the bridge. There was no eastbound traffic. Behind Haywood was another westbound truck driven by defendants' witness Em-

bery. Embery and Haywood had been conversing by CB radio a short time before. It was Embery's testimony that he had a clear view of the Haywood unit and observed it as it entered the bridge.

Both Haywood and Embery testified that the Haywood unit was traveling "a little to the right hand side of the center" of the highway—that Haywood was "straddling the center line." It was the testimony of these two witnesses that no portion of the Haywood unit struck or collided with the northeast hazard boards or with the northeast railing. Their testimony was that no portion of the Haywood truck struck any portion of the bridge. Haywood had no explanation "as to why this bridge fell out from beneath me."

The state's evidence, developed primarily through Corporal Sisk, was that after the Haywood accident, the Haywood unit and the center span were in the river. Sisk, who came to the accident scene from the west, used a railroad bridge, located south of Bridge J–92, to cross the river and inspect conditions east of where the center span had been. In this inspection Sisk found that two of the northeast hazard boards, those located immediately east of the east end of the north curb, had been separated from their poles. Significantly Sisk found that the northeast rail, the entire 75½ feet of it,[2] "was completely gone and appeared to be torn out of the concrete [curb]." Sisk found "tire marks or black marks" down the "outside" of the north curb. Sisk went back to the scene "the next day, in the afternoon." Sisk identified unchallenged photographs showing the poles on which the two missing northeast hazard boards had sat.

There was no evidence of any bridge-damaging event taking place between the two accidents. Manifestly the state's case depended upon its ability to convince the jury that the Haywood unit struck the two

missing northeast hazard boards and the northeast railing, tore the latter from the concrete curb, and thereafter collided with the northeast end of the center span causing the bridge to collapse.

The testimony of Haywood and Embery was to the effect that there was no contact between the Haywood unit and the northeast hazard boards or the northeast railing. Any evidence tending to demonstrate such contact would clearly have jury significance.

Through Corporal Sisk the state attempted to introduce Exhibits 9, 10, 11 and 12. A second effort to introduce Exhibit 10 was made by the state when it called Haywood as an adverse witness.

Shown Exhibit 9 by the attorney for the state, Corporal Sisk testified that he could identify the photograph as showing "a part of the cab of the truck after it was pulled from the St. Francis River." In the photograph, said the witness without objection, "there appears to be a pipe railing." The exhibit was then offered into evidence.

At this juncture defense counsel interrogated the witness and extracted this testimony: The witness was not present when the photograph was taken. "Q. That wasn't the way this truck was on December 9th or 10th, was it? A. I don't understand your question. Q. Well, it was down in the water then, wasn't it? A. Yes, sir." "Some big cranes" were used to move "this piece of equipment" to the point where the photograph was taken. "There was quite a bit of movement and pulling and tugging around there with the cranes to get this truck and this bridge out of there." "They drug it across the bridge and finally got it up on dry land a distance of some number of feet." "That is the way the trailer [sic] looked after they dragged it up across the bridge and up onto the bank." It took "two or three or four days" to do this. "It was a pretty major job." The witness did not

2. One witness said the northeast railing was approximately 73½ feet long. The discrepancy between that figure and Sisk's testimony of 75½ feet is not mentioned by the parties and seems insignificant.

recall specifically that there were times when some pretty heavy things would fall and slam around out there "but I am sure that is correct." The witness did not see any pieces of the bridge drop into the water.

The witness then testified, in answer to a question by the state's attorney, that Exhibit 9 did "fairly and accurately represent the condition of the cab of the truck after it was pulled out of the water." The state's attorney then offered the exhibit.

Defense counsel then said, "I would object to that. That is the way it appeared after it had been pulled and tugged on and I don't think that would be relevant nor material to any of the issues in this lawsuit."

The court then asked the attorney for the state, "What is this exhibit for?" The attorney responded that Corporal Sisk "will identify the pipe, he will personally testify that piping is a part of the handrailing or part of the railing. He will testify that that is what it is and two or three other photographs that show the truck in basically the same condition with that piping or railing and he will testify what it is." The court then stated: "Assuming that he does that, what has that got to do with this lawsuit?" The state's attorney responded, "I think a reasonable inference can be drawn from that testimony that the only way, reasonable way, that that handrailing from the bridge could have gotten into the truck would have been from the truck hitting or astraddling the curbing and ripping the railing out. That is the purpose of the exhibit." The court inquired whether or not the state would "have some other testimony about that railing being through that truck while the truck was in the bottom of the river." Upon receiving a negative answer to that inquiry, the court sustained the objection.

The state's attorney then stated: "I have three other photographs (Exhibits 10, 11 and 12) with the same condition and I would like to make an offer of proof." In both Exhibit 9 and Exhibit 10 two pieces of railing, each several feet long, appear to be imbedded in the cab, one of them in the radiator grill.

With regard to Exhibits 10, 11 and 12, the offer of proof by the state's attorney was as follows:

"Exhibit Number 10[3] is a photograph and we offer the proof would be as follows: That it is a picture of the cab as it existed after taken out of the water and Trooper Sisk would testify it is a fair and accurate representation as it then existed. He would further testify that in addition to the cab of the truck, there is part of a bridge railing extending into the cab. He would identify it as a pipe from the bridge railing. Exhibit Number 11 is a closer view. Exhibit Number 11 is a closer view of the cab after it had been taken out of the water and Trooper Sisk would also testify that there is a part of a bridge railing into the cab, and Exhibit Number 12 the same, is a photograph, close-up photograph, of Exhibit Number 11 and Trooper Sisk would also identify it as being a part of that bridge railing in the cab of the truck and would identify a joint of the bridge railing and that would be his testimony if he would be allowed to so testify."

Defense counsel objected to the offer of Exhibits 10, 11 and 12 "for the reason that it shows the vehicle after the wrecking operation, after it had been pulled or tugged on by the derricks or cranes, and then drug and placed on the banks some days after the accident. The condition at that time would not be relevant or material unless there would be some proof that there had been no change whatsoever."

The court sustained the objection.

Called as an adverse witness by the state, and asked if he could identify Exhibit 10,

**3.** There is an obvious misprint in the transcript. The transcript refers to Exhibit 11 but it is clear from counsel's statements, and from this court's examination of the exhibits, that counsel was in fact describing Exhibit 10 and not Exhibit 11.

Haywood replied, "That is what is supposed to be my truck." Asked whether the exhibit "fairly and accurately represented the condition of the truck after it was pulled out of the water," the witness gave an affirmative answer.

This court's examination of Exhibits 9, 10, 11 and 12, coupled with its examination of the transcript dealing with their identification, most of which has been set forth, leads it to the conclusion that the trial court erred in excluding the four photographs. Corporal Sisk was present when the Haywood tractor, with the rails imbedded in it, was removed from the river. He identified the photographs as being fair representations of the condition of the cab at that time. There was no direct evidence that the movement of the cranes caused the rails to be imbedded in the cab and such a possibility seems primarily the product of speculation on the part of ingenious defense counsel. The photographs themselves seem to militate against the soundness of that speculation. In any event that possibility was properly a basis for cross-examination attacking the weight to be given to the photographs rather than a bar to their admissibility. This court holds that the state laid an adequate foundation for the admission of Exhibits 9, 10, 11 and 12 and that the trial court committed reversible error in excluding those exhibits.

The brief of defendant Haywood argues that the trial court's judgment should be affirmed for the reason that the state "failed to make a submissible case of negligence under any theory pleaded in the petition." The petition contained charges of excessive speed, failure to keep a proper lookout, and failure to stop, swerve or slacken speed. In support of this contention defendant Haywood's brief merely argues the weight of the evidence, primarily the testimony of the eyewitnesses Haywood and Embery, to the effect that there was no contact between the Haywood unit and any portion of the bridge. The testimony of Corporal Sisk, if believed by the jury, would have entitled the jury to find that the Haywood unit struck the two hazard boards, tore out the northeast railing, and then collided with the superstructure. These facts would support a finding by the jury that Haywood was negligent in one or more of the particulars assigned.

The judgment is reversed and the cause remanded.

MAUS, C. J., and TITUS and BILLINGS, JJ., concur.