## John Killary v. Burlington-Lake Champlain Chamber of Commerce, Inc.

[186 A.2d 170]

September Term, 1962

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed November 7, 1962

*Joseph C. McNeil* and *Bernard J. Leddy* for the plaintiff.

*Edmunds, Austin & Wick* for the defendant.

**Smith, J.** This is an action in tort. Trial in the Chittenden County Court resulted in verdict and judgment for the plaintiff. The questions presented by this appeal are: (1) claimed error on the part of the lower court in submitting the case to the jury, and (2) error on the part of the lower court in permitting the jury to see colored slides of the face of the plaintiff showing the injuries received from the accident, and pictures taken during the various phases of the operation performed on plaintiff's face.

The factual situation presented is an unusual and interesting one involving injuries received by a contender in a boat race while participating in a Waterama, so-called, sponsored by the defendant Chamber of Commerce, and held in Burlington Harbor on Lake Champlain, August 3, 1958.

The defendant, Burlington-Lake Champlain Chamber of Commerce, Inc., is a non-profit organization of business and professional men in the Burlington area. Its nine hundred members pay annual dues of $30 and like other organizations of this type, the purpose of the organization is to further the economic welfare of its members.

A project of this defendant for some years had been conducting a Waterama in Burlington Harbor. The Waterama of 1958, which lasted for four days, was similar to others held in the past and included such events as water skiing and inboard and outboard motorboat races. The plaintiff was a participant in the outboard motor racing and received the injuries he complains of while a contestant in one of such races.

Lake Champlain extends in a generally northerly-southerly direction. Burlington is on the easterly shore of the lake, and its harbor is created in part by a breakwater, located westerly in the lake some little distance from the Burlington shoreline. This breakwater extends rather erratically northerly and southerly. The events of the Waterama were held in the waters of the lake between the breakwater and the Burlington shoreline.

The course for the outboard race was about 3,100 feet in length, parallel with the shoreline and the breakwater, and rectangular in shape. Two buoys were placed about thirty to forty yards apart, at the north and the south end of the course, and the racers had to round such buoys at the end of each straight leg of the course.

Burlington Harbor is a public one. It is used by numerous pleasure boats as well as by ferries crossing Lake Champlain to the New York shore. A municipal dock, known as the Salt Dock, extends into the Harbor at a point which was just easterly of the southerly end of the race course. Just north of the Salt Dock and between it and the dock of the Champlain Transportation Company, is a slip. On the south side of the Champlain Transportation dock were gas tanks so that boats entering the slip could be fueled up. At the time of the Waterama in question, this was the only place in the harbor where boatmen could have gas and oil delivered into their various crafts.

Northerly, along the harbor front, from the Champlain Transportation dock were other structures and docks, including the Coast Guard basin and a Marina Center. The Marina Center is located at a point which was approximately opposite, and easterly, of the northeastern buoy marking the racing course.

In preparation for the Waterama, the defendant Chamber of Commerce had set up various committees to take care of various details in both the planning and the operation of the Waterama. An outboard racing committee set off the racing course previously described, and general arrangements for the safety of both spectators and participants in the Waterama were in charge of a safety committee.

The safety provisions included obtaining permission from the United States Coast Guard to hold the racing events, together with an agreement from the officer in charge to furnish one large and one small vessel to patrol the course. The safety committee also arranged for seven other boats to patrol the course. The committee anticipated that two hundred and forty craft of various sorts would be present for the racing events and that proper patrolling of the racing area was necessary to prevent boats using the area from interfering with the racing contestants and endangering their safety.

The plaintiff was a veteran of outboard racing. He paid an entry fee to participate in the racing events and was informed of the measures that had been taken for the protection of the racing participants. The boat he was to drive in the race was about ten feet three inches in length, built of wood and plywood, and powered by a 20 cubic inch racing outboard motor, with a 20-24 H.P. rating. The top speed of such a boat was from 45 to 50 m.p.h. and when running at top speed little more than one foot of the bottom of the craft was in actual con-

tact with the water. The boat was driven by the driver while in a kneeling position.

There had been a number of races prior to the one in which the plaintiff participated. The precautionary and protective measures taken by the defendant to protect the southerly end of the racing course from being endangered by the presence of other than the racing boats during the contests was by means of patrol boats.

A large Coast Guard vessel, a tug-type craft of some sixty-eight feet, patrolled the north end of the breakwater, while a smaller vessel of the Coast Guard, a dinghy powered by an outboard motor, patrolled the area in the vicinity of the southwest buoy.

The boat of Colonel Delorme, the Harbormaster, was stationed at the Salt Dock, and the traffic in and out of the slip between the Salt Dock and the dock of the Champlain Transportation Company was controlled by this gentleman. A cruiser, owned by a Mr. Duba, was stationed some two hundred yards from the south end of the racing course. These patrol boats were all present by reason of the request of the defendant.

The plaintiff, who had arrived at the scene of the Waterama early in the day, noticed the patrolling boats and testified he relied upon them for his protection.

The starting point for the races was opposite the Marina Center. The boats would race northerly, round the northeast and northwest buoys, then proceed southerly on the western side of the rectangular course, round the southwest and southeast buoys and then head northerly on the eastern side of the rectangle. This course would be repeated until the boats had completed the number of laps around the course that constituted the racing distance.

At the starting time of the race in which the plaintiff was to participate, the sun was bright, the air clear, and there was a six-inch chop on the lake waters, making for ideal boat racing conditions. Trophies were awarded to race winners by the defendant Chamber of Commerce and each contestant was expected to put forth his best efforts to win. Unknown to the plaintiff, and presumably the other contestants in this race, was that the protection which had previously been extended to the racing course had become non-existent at the starting time for this particular race.

The Coast Guard boats, in answer to a distress call from some distant part of Lake Champlain, were already some three miles north

on the lake. Mr. Duba had taken his boat southerly on the lake to a point approximately half a mile from where it had originally been stationed. The harbormaster, Col. Delorme, was at the Marina Center, talking with officials of the Chamber of Commerce, and not on the Salt Dock controlling the boat traffic in and out of the slip. None of these absent patrols had been replaced.

The race in which the plaintiff was injured had six entrants, including the plaintiff, and the race consisted of several laps around the course. Upon the commencement of the last lap two of the contestants were far in the lead of the plaintiff, one boat was well to his rear, and the boat of the plaintiff was slightly ahead, and in the middle of the remaining three boats, so close together that "a twenty-foot circle would have taken us all in."

As he approached the southern turn of the course, the plaintiff noticed a boat coming from the direction of the slip or Salt Dock, heading in a westerly direction toward the racing course.

As the boats raced south on the westerly leg of the course the plaintiff noticed a spectator boat heading toward the southerly part of the course from the east. Other evidence indicated that the boat, one of good size, came from the slip next to the Salt Dock and despite the warning shouts of spectators, continued on a southerly course at a high rate of speed, either between or just outside of the southern buoys marking the racing course. The identity of the boat and its owner were never established.

This spectator boat left behind it a wake from its passage some three feet in height. Just as the plaintiff's racing boat rounded the southwest buoy it came into contact with the wake. The wake caused the boat to be thrown violently sideways, and into the path of a competing boat driven by a Mr. Pepper. The Pepper boat passed directly over the boat of the plaintiff. It tossed the plaintiff into the air ahead of it so that the plaintiff fell again in the direct course of the Pepper boat, and it ran directly over him. Many of the severe injuries received by the plaintiff to his face and body were undisputedly caused by the whirling propeller of the Pepper boat as it passed over him.

The first exceptions briefed by the defendant are to the failure of the trial court to direct a verdict in its favor in accordance with its motions at the close of the evidence of the plaintiff, and properly renewed at the close of all the evidence in the case. The grounds there

given and here briefed, are that (1) plaintiff assumed the risk of the injuries sustained; and (2) that there was contributory negligence on the part of the plaintiff which, as a matter of law, barred his recovery.

It is the contention of the defendant that the actions of the plaintiff in continuing to race on the course, after his sighting of the spectator boat, were such that the trial court should have granted the motion for the directed verdict.

■ In considering the claim of error relative to the refusal of the lower court to direct a verdict in favor of the defendant we must, of course, consider the evidence in the light most favorable to the plaintiff. *Benoit* v. *Marvin,* 120 Vt. 201, 203, 138 A.2d 312.

It is the testimony of the plaintiff that he first saw the spectator boat in the vicinity of the Salt Dock and slip heading out toward the breakwater. This was at a time when he was heading in a southerly direction, approaching the southern turn on the course. It was also at a time when, as the plaintiff testified: "I also had to pay attention to what I was doing, to my driving and the other fellows behind me and beside me."

In support of its position, the defendant states that the plaintiff was an experienced boatman and that he knew that a craft of the size of the spectator boat would leave a substantial wake. By reason of the plaintiff's previous boating experience, says the defendant, he had knowledge that a wake of this nature constituted a real hazard if it came into the course of a small racing craft such as was then being operated by the plaintiff. The plaintiff, having knowledge of the potential danger involved, and seeing the spectator boat heading in the general direction of the racing course, assumed the risk of the danger which he later did encounter by proceeding on the course. Even, says the defendant, if the plaintiff had a right to assume no spectator boat would come on to the race course at the start of the race, from the moment he knew the boat was near the course and heading toward it, he assumed the risk of the wake which caused the accident.

■ The assumption of risk doctrine has no application unless there is knowledge of the existence of the risk, together with an appreciation of the extent of the danger. One cannot assume a risk unless one knows about it, appreciates it, and consents to assume it. It is

only when one, knowing and comprehending the danger, voluntarily exposes himself to it, even though not negligent in so doing, he is deemed to have assumed the risk for an injury resulting therefrom. *Lewis* v. *Vermont Gas Corp.*, 121 Vt. 168, 184, 151 A.2d 297, and cases cited thereunder. Mere knowledge of the risk does not necessarily involve consent to the risk. The circumstances must be such as to warrant the inference that the plaintiff encountered the risk freely and voluntarily with full knowledge of the nature and extent thereof. *Gover* v. *Central Vermont Railway Co.*, 96 Vt. 208, 215, 118 Atl. 874.

The circumstances here are that the defendant had assumed the responsibility of seeing that the racing course was free from interfering boat traffic, and that the plaintiff had knowledge of this fact, and relied upon it in entering the race. Although, as we have already seen, the various boats and individuals guarding the southern end of the course had left their respective posts at the time of the starting of this particular race, this was without the knowledge of the plaintiff.

As the plaintiff, himself, stated upon first seeing the spectator boat: "I had no idea where the boat was going. I had in mind that I was being protected, that there would be patrol boats." In order for the plaintiff to have full knowledge of the nature and extent of the risk that he was to encounter in the case at hand, it was necessary for him to have been fully aware of several circumstances.

He would had to have known that there was no guard or patrol boat to protect him from the wake of the spectator boat if it came onto or near the racing course. He would also have had to have knowledge that the spectator boat would come on or near the course ahead of him, traveling in a direction and with a speed that would create a wake of menacing proportions which he would meet on his course.

The evidence is that plaintiff not only relied upon the protection of the course, which he had a right to assume was being provided by the defendant, but as far as the wake was concerned, "I never noticed the wake, saw it, or had any idea where it was or that it was coming until it hit me."

Under the circumstances of this case it cannot be said that the evidence justified an inference that the plaintiff had the full knowledge of the nature and extent of the risk and danger which he was to encounter, and then voluntarily exposed himself to it, which would be necessary for the application of the doctrine of the assumption of risk.

No error is found in the lower court's refusal to direct a verdict for the defendant upon that ground.

The same evidence which we just considered in deciding the matter of assumption of risk is also applicable on the question of the contributory negligence of the plaintiff which the defendant in its brief claims to have been a matter of law in the instant case and should have resulted in a verdict directed for the defendant. Both plaintiff and defendant have cited *Benedict* v. *Union Agricultural Society,* 74 Vt. 91, 52 Atl. 110 as the only case in this jurisdiction having to do with the matter of contributory negligence on the part of a participant in a racing contest.

The contest in which the plaintiff was injured in the Benedict case was a bicycle race. The injuries to the plaintiff in that unmechanized day took place when he ran into a horse and sulky which was on the racing track.

The defendant was a fair association, which had advertised the holding of the races, charged a fee to the competitors and awarded prizes to the various winners of the race. With the substitution of a racing boat for a bicycle this factual situation is identical to the one in the instant case. The statement made by the Court: "He (referring to the plaintiff) had a right to assume that the defendant expected him to ride in the usual way, and as fast as possible, if need be, to win the race. He also had the right to expect that the defendant would exercise due care to keep the track clear," in the Benedict case is both applicable and true here.

The contributory negligence claimed in the bicycle case was that the plaintiff should have seen the horse-drawn vehicle on the racing course and avoided it. Plaintiff's evidence was that his head was bent low over the handle bars of his two-wheeled vehicle, which was the accepted racing style of cyclists of that day, so that he watched the ground only a few feet ahead of him. Further, that the plaintiff was in hot competition with another cyclist who was pedalling so close to him that it necessitated a continual watch on his part to avoid a collision.

The Court stated: "Although it is true that the negligence of the defendant did not excuse the plaintiff from the exercise of due care, he was not called upon to anticipate negligence on the part of the defendant." The Court then went on to point out that conduct in driving

that might be considered reckless on a public highway would not necessarily be so when driving in a race, where a great speed is required, and with persons in attendance whose duty it was to keep the track clear. Under such circumstances, driving that would be imprudent on a highway might be within the care and prudence of a prudent man. The holding was that under the circumstances of the case, the question of contributory negligence on the part of the plaintiff was for the jury.

In the instant case the plaintiff was not injured by a collision with a fixed object as in the Benedict case. The cause of the injury to this plaintiff was the wake from the spectator craft, and not the boat itself. The wake of a boat is a turbulence of the water caused by the passage of the boat through it. A wake is in constant motion from the time that it is made by the passage of the boat and extends in two directions, one from each side of the point of travel of the boat causing it.

It must necessarily follow that to find this plaintiff contributorily negligent, it would be necessary to find that he had the duty not only to observe the wake which caused his injury, but to compute from its speed and direction whether it would intercept his racing course to his damage. This to be done at a time when he was also engaged in avoiding collision with boats to each side of him in hot competition for the lead position.

Under the circumstances presented here, obviously requiring more judgment on the part of this contestant in a motorboat race than was called for on the part of the cyclist in the Benedict case, the question of contributory negligence was one of fact for the jury. It was for the jury to determine from the factual situation presented whether the acts of the plaintiff were those of a careful and prudent man faced with the same situation. We find no error in the refusal of the trial court to direct a verdict for the defendant on this ground.

The defendant also contends that it was the negligence of the unknown operator of the spectator boat in coming upon the racing course that caused the injury of the plaintiff, and not that of the defendant. But there was a duty upon the part of the defendant to keep the racing course clear. *Benedict* v. *Union Agricultural Society,* 74 Vt. 91, 98, 52 Atl. 110. The spectator boat came on or near the racing course because of the failure of the defendant to maintain its patrols and guards during the race in which the plaintiff was a contestant.

■ "When negligence is established, liability attaches for all the injurious consequences that flow therefrom until diverted by the intervention of some efficient cause that makes the injury its own." *Bennett* v. *Robertson,* 107 Vt. 202, 209, 177 Atl. 625, 98 A.L.R. 152.

If the intervening cause is a natural and proper result of the original negligence it will not necessarily prevent a recovery thereon. An intervening cause, to stand as the responsible cause of the ultimate result, must be a new or independent force or agency breaking the chain of causal connection between the original wrong and the result. The real test is whether "it is something in the eye of the law the person charged was bound to anticipate." If so, the causal connection is not broken.

It can hardly be argued in the present case that the defendant could not anticipate that spectator boats would not wander on or near the racing course if the guard and patrol boats were withdrawn. The very purpose of establishing such patrols was for the purpose of preventing the contingency that took place and caused the injury to the plaintiff. The negligence that allowed the spectator boat to enter upon the waters that were presumed to be barred to its passage was that of the defendant, and the causal connection between the cause of the injury to the plaintiff and the negligence of the defendant was not broken.

The final question presented for our determination is upon the exception of the defendant to the admission of colored slides into evidence by the lower court showing the injuries received by the plaintiff from the accident and the course of the surgical and medical treatment undergone by him to correct and heal them.

The evidence was undisputed that the plaintiff received serious, painful and permanent injuries as a result of the accident, both to his abdominal region and to his face. A series of x-ray pictures were taken of these injured portions of the anatomy by a Dr. Foley, a qualified radiologist, and they were received into evidence without objection by the defendant and exhibited to the jury. Testimony was given by a Dr. Shea, a general surgeon, upon the unusual and severe injuries received by the plaintiff as well as to his grotesque and lacerated appearance at the time of his entrance to the hospital. Dr. Shea further testified as to the surgery and repair work done to correct as far as possible the damage to the plaintiff's abdominal organs, the de-

tails of which are not important to the consideration of the question presented.

The repair work done on the injured face of the plaintiff was performed by Dr. Bernard B. Barney, a plastic surgeon. He testified that there was extensive damage to the plaintiff's eyes, his nose and the fracturing of various facial bones, and he described the operative treatment used by him to repair this damage. He testified that he took colored photographs of the plaintiff's face, showing it as it appeared immediately after the accident, followed by further photographs, also in color, showing the various steps of the operation, as well as the process of recovery. It was Dr. Barney's testimony that the various colored photographs were fair and accurate representations of the plaintiff's condition at the various times they were taken.

■ The defendant has stated in its brief that the physical condition of the plaintiff was not in issue in this case because the defendant did not dispute or deny the testimony of the medical experts offered by the plaintiff on such physical condition. By pleading a general denial to the complaint of the plaintiff, the defendant put in issue the extent of the injuries suffered by the plaintiff. *Reeves* v. *City of Springfield,* 110 Ohio App. 387, 171 N.E.2d. 178. Further, the record shows that each of the medical witnesses was cross-examined by counsel for the defendant. It follows that the physical condition of the defendant was an issue in the case for the determination of the jury.

■ The rule in this jurisdiction is that the whole question of the admissibility of photographs is one largely within the discretion of the trial court and the ruling thereon is not ordinarily reviewable. *Colson* v. *State Highway Board,* 122 Vt. 392, 393, 397, 173 A.2d 849; *State* v. *Gravelle,* 117 Vt. 238, 241, 89 A.2d 111.

However, this is the first time we have been called upon to rule as to the admissibility of colored photographs. The major objection of the defendant to the admission of the photographs in the instant case is that color tends to exaggerate the actual injuries, and thus inflame the prejudices and passions of the jury by their gruesomeness. The argument of the defendant is that color photographs make sharp contrasts that may be unrealistic and that color pictures tend to overemphasize and distort.

· The admission of these colored photographs and the viewing of them by the jury through use of a projector which magnified the colored slide upon a screen, says the defendant, deprived it of the fair and impartial trial to which it was entitled.

The defendant admits, while the majority of photographs admitted into evidence are of the black and white variety, that the common-sense rule should be that colored photographs should be admissible in a situation where black and white photographs are admissible. We think this can hardly be denied, for the human eye views nature and all its creatures, as well as man himself, in color, and not in black and white. It follows that a colored photograph that accurately and truly reproduces the actual colors of the object or scene which is the subject of the picture, actually presents to the viewer a more realistic view of the scene or object than would a photograph in black and white.

■ The essential requirement is, as in black and white photographs, that the trial judge ascertain by suitable preliminary inquiry before admitting such evidence, at least that it is sufficiently verified that it reflects the situation fairly, and that it is likely to be of sufficient assistance to warrant its use. *Horowitz* v. *Bokron,* 337 Mass. 739, 151 N.E.2d 480.

In the Minnesota case of *Floen* v. *Sund,* 255 Minn. 211, 96 N.W.2d 563, that Court held : "Colored photographs are admissible in personal injury actions to indicate the nature and extent of the injuries so long as they accurately portray and do not exaggerate the injury."

The first colored photograph in the series offered was grotesque and unpleasant in that it showed the face of the plaintiff so masked and covered with both fresh and dried blood that the actual injuries could not be seen. Offered alone it might well have been found to be an inaccurate portrayal of the extent and nature of the injuries, which exaggerated them and made the admission of the lone exhibit prejudicial. And this, although no contention was made that the slide sought to be admitted did not represent the conditions as they actually were at the time of making the photograph.

But later slides or photographs in the same series did depict the actual injuries to the face of the plaintiff. Later, photographs in the same series accurately depicted the healing of the injuries received, as well as marked improvements in the facial appearance of the plaintiff

due to operative treatment. It is significant, perhaps, that no objection was made by the defendant to the admission of these latter slides, and their portrayal on the screen, although they, too, were in color.

The test of admissibility of colored photographs is the same as it is for models, maps, plans and black and white photographs. Preliminary evidence is required to show that they are sufficiently accurate to be helpful to the jury, and this is a question of fact for the determination of the court and is not ordinarily reviewable. *State v. Gravelle*, 117 Vt. 238, 241, 89 A.2d 111. The matter of the accuracy of the color reproduction in the colored photograph may require additional evidence for such determination by the trial court, in addition to that which might be sufficient for a determination of the accuracy of black and white photographs, but the principle remains the same. It still remains a question of discretion on the part of the trial court.

In considering this question, we are bound to indulge every reasonable presumption in favor of the ruling below, bearing in mind that the trial court was in a better position to determine the question. We cannot say, on the record before us, that the trial court exercised its discretion on grounds or for reasons clearly untenable; or to an extent clearly unreasonable, which, in this state, is the recognized test of abuse of discretion. *Towle v. St. Albans Publishing Co.*, 122 Vt. 134, 142, 165 A.2d 363.

However, another question is presented to us by the defendant on the admission of the colored photographs, which must be decided by us before making the final ruling on their admissibility.

At the time of its first objection to the admissibility of the pictures or slides, the defendant stated that it had not had a chance to examine the offered pictures and requested an opportunity to examine the slides before they were exhibited to the jury.

The lower court handled the request by giving counsel for the defendant, as well as the court, an opportunity to examine each picture in slide form before it was put in the projection machine to be magnified on a screen for the jury's view. Defendant objected to the showing of the slides to the jury, and after the showing of the first slide, admitted into evidence, moved for a mistrial on the grounds of prejudice. The motion was denied.

After the jury had seen the various slides admitted by the trial court over the objections of the defendant, the defendant renewed its motions for a mistrial on the grounds of prejudice and added a new ground. This ground was based upon the fact that only the slides, small in size, had been exhibited to court and counsel, while the jury was shown the slides on a screen which enlarged their size, thus, said the defendant, adding to the gruesomeness of the pictures and making more vivid the color and details shown on the slides.

We think it would have been better procedure for the trial court to have had the preliminary showing of the colored slides to both court and counsel made in the exact manner, and in the same size, as they were later exhibited to the jury. However, in the instant case, the error, if any, was harmless. There is no evidence before us to indicate that the enlargement of the colored slides by their projection on a screen in any way distorted in either color or detail the same features shown on the smaller slide. In the absence of evidence that the enlargement on the screen failed to accurately portray the injuries shown on the slide, nor to exaggerate the injury, no harm was done the defendant which requires reversal on this ground. We doubt that size alone can determine the admissibility of a photograph of this nature. If so, a photograph or picture of any subject depicting the object in less than its natural size (a common characteristic of most photographic pictures) would be as equally objectionable as being unrealistic, as one depicting the photographed object in a size larger than natural.

The exceptions by the defendant to the admissibility of the colored slides are not sustained, and the refusal of the trial court to direct a mistrial in accordance with the motion of the defendant is found to be correct.

*Judgment affirmed.*