## State of Vermont v. Maurice W. Oakes

[276 A.2d 18]

No. 8-68

Present: Holden, C.J., Barney, Smith and Keyser, JJ., and Billings, Supr. J.

Opinion Filed February 18, 1971

Motion for Reargument Denied April 7, 1971

*James M. Jeffords,* Attorney General, and *Martin K. Miller,* Assistant Attorney General, for Plaintiff.

*John Parker,* Springfield, Vermont, for Defendant.

**Barney, J.** The jury found the respondent's shooting of his wife to be murder in the first degree. Review, absent a written waiver, follows such a conviction as a matter of course. 12 V.S.A. § 2383. The respondent has, in his brief, cataloged errors beginning with pre-trial proceedings and going on through the trial to issues raised by motions to set aside or reduce the degree of the verdict. The state has replied and the matter is for disposition.

The testimony, concerning the events at the Oakes home on the evening of May 26, 1967, and subsequently, came in without contradiction. There was a phone call that came into the Windsor Police Department at almost exactly eleven o'clock in the evening. A male voice asked for help, saying something to the effect that, "She's here on the floor, dying." The voice was identified by the dispatcher on duty at the time as the respondent's, after hearing him speak when he was later brought into the police station.

When the call was received a cruiser was sent to the scene, a single family dwelling off North Main Street. The officers in the police car received the call at 11:03 and arrived at the scene at 11:10. As they came up to the kitchen entrance the respondent was visible through the glass in the upper part of the door. He was kneeling over a woman on the kitchen floor. Two small girls were standing in the kitchen. The door was unlocked and the officers entered, opening the door only partially, to avoid disturbing the woman's head close to the door.

Officer Leonard helped the respondent, who was distraught and sobbing, to a nearby chair and asked him who the woman was and what happened. The respondent answered, "This is my wife Rosalie." The officer asked, "Rosalie who?" The respondent replied, "Rosalie Oakes." In answer to the question what happened, the respondent said, "I shot her with a 22-410 over and under." This exchange took place while the officer

was assisting the respondent to a chair in the kitchen. The officer immediately told the respondent that he had a right to remain silent and that he was entitled to an attorney.

Officer Robinson, his companion, meanwhile was checking the woman's wrist for signs of a pulse, without success. He asked the respondent for his wife's full name and date and place of birth, which the respondent gave. He returned to the cruiser and called for a doctor and for the chief of police. When he reentered the house he sent one of the two little girls, children of the couple, upstairs for a blanket to cover the body. He then went into the adjoining room, which was lighted, to look for something to cover the glass in the kitchen door. An ironing board was set up there and on it was a 22-410 over and under rifle.

As he was covering the window in the door a neighbor came on the porch. After a brief exchange with him, the officer sent the two girls upstairs to get dressed. The respondent was insisting he saw signs of breathing in his wife's body and Officer Leonard was trying to calm him and persuade him to stay seated. Officer Leonard then also checked unsuccessfully for a pulse, and for the first time detected some blood near the head area. The respondent volunteered that he got out the rifle to show his wife what he would do if deer bothered the garden at the new house they were building in Reading. He said he didn't know the gun was loaded, because he never brought a loaded gun into the house. He repeated his statement about deer in the garden several times.

Meanwhile Officer Robinson had helped the little girls on with their shoes and sent them next door with the neighbor. All this had transpired in about nine minutes, and at 11:19 the chief of police arrived. Officer Robinson met him outside and brought him in past the body of Mrs. Oakes. Mr. Oakes had been given a cup of coffee that was already poured when the officers arrived, and was chain-smoking cigarettes. There was a pot of hot coffee on the stove, and more coffee was later given to the respondent.

The chief of police began to take pictures in connection with the investigation, and the respondent objected to this. A short time later, a physician arrived. He determined that Mrs. Oakes was dead after a brief examination. To make that examination he turned the body over on its back and the respondent took

violent exception to the examination. When the doctor told him Mrs. Oakes was dead he carried on violently, shouting that she couldn't be dead, he didn't believe she was dead, that it was an accident and if she was dead he might as well be dead too. He then began to flail around with his hands and started to move in the direction of the den where the gun was. The officers present, with the help of the doctor, subdued him and handcuffed him. He was then taken into the adjoining living room and seated on a couch with Officer Leonard.

At this point he seemed to calm down. He volunteered the information that he recalled occasions when he had met each of the officers in the past. After about an hour in the living room he was taken to the Windsor police station. Both officers testified that, in their opinion, the respondent was under the influence of alcohol at the time they went to the Oakes residence.

At about six o'clock the following morning the chief of police and Officer Robinson returned to the Oakes house to continue the investigation. The police returned again at eleven o'clock in the morning of the 27th accompanied by a state police investigator. This time they had with them a search warrant. Certain questions in connection with these visits are raised by the respondent and the necessary facts pertaining to these questions will be detailed at the time they are dealt with.

The defense raised by the respondent had two aspects. The first was that the shooting was accidental, and that therefore the ingredients necessary for a first degree murder conviction were lacking. The second was the defense of insanity, a claim that respondent lacked the capacity to comprehend the criminality of his act. Witnesses testified in support of these defenses, but the respondent did not take the stand.

The first issue raised by the respondent relates to the denial of his motion for access to the testimony given before the grand jury. Unless otherwise ordered by the supreme or county court, the minutes of such testimony must remain in the possession of the prosecuting officers. 13 V.S.A. § 5605. The courts concerned have a discretionary power to grant disclosure under our law. *State* v. *Goyet,* 119 Vt. 167, 171, 122 A.2d 862 (1956). The justification for the request in the *Goyet* case, was grounded on a reference in *State* v. *Brewster,* 70 Vt. 341, 348, 40 A. 1037 (1898), to the justness

of granting the accused an opportunity to know and to prepare to meet, contradict and explain the testimony brought against him. The Court in *Goyet* sustained the denial of access in the face of the *Brewster* dicta. With the present rights of an accused to achieve the *Brewster* objectives through his rights of discovery and deposition, 13 V.S.A. § 6721 *et seq.*, the necessity of resort to grand jury minutes for that purpose has been all but dissipated. The justification for overruling a refusal of access to grand jury minutes must now rest on other or stronger policy demands than even *Goyet* required. None have been advanced here, and the ruling below is sustained. *State* v. *Miner,* 128 Vt. 55, 258 A.2d 815, 820 (1969).

Under the provisions of 13 V.S.A. § 4803 the respondent was committed to the Vermont State Hospital for observation to determine whether or not he was legally sane. His actual examination was conducted by a private psychiatrist hired by the hospital on a contract basis. The respondent complains that since the statute reads that the person be ordered "into the care of the superintendent of the Vermont State Hospital, to be detained and observed by the superintendent . . ." his examination was unlawful and in violation of his constitutional rights and the testimony of the psychiatrist should have been suppressed.

The issue is not the professional qualification of the examining psychiatrist but the propriety of the delegation of this duty by the superintendent to another. Presumably the same question would arise if the examination had been carried out by any doctor on the hospital's professional staff other than the superintendent. This is an unduly restrictive view of the statute, since nothing by way of a policy consideration demanding that the superintendent give such examinations his undivided personal and individual attention. Delegation of duties, in whole or in part, is a characteristic of governing offices of institutions such as mental hospitals. To say that this normal and expected operation disqualifies the testimony of the examiner reads a particularization into the statute that its purpose does not require.

A related complaint of the respondent concerns the later examination by this same psychiatrist of the respondent with respect to his competency to stand trial. In essence, the

respondent says that he does not challenge the right to have him examined for competency, but his objection was that using the same psychiatrist enabled that doctor to extend his examination relative to respondent's sanity as well. Assuming all this to be true, there is nothing improper about his further examination even in connection with his sanity. The issue is important to both the State and the respondent, and the use of every appropriate opportunity to shed full light on the question is not to be made into error. Full opportunity is likewise afforded the respondent to assemble and present his own expert evidence in the issue, all to the end that the jury may most fairly decide the question. 13 V.S.A. § 6602; 32 V.S.A. § 1555.

Before trial, the respondent moved for the suppression of certain photographs and items of physical evidence. It was evidenced that after the respondent was taken to the police station, everyone left the premises and they were closed up. About six o'clock on the morning of the 27th the chief of police and another officer returned to the Oakes home and took some pictures. Again, at about eleven o'clock, they returned, accompanied by other law enforcement officers for further investigations. This time they had a search warrant which was posted on the door of the Oakes house on entry.

The second visit of the police chief, at six in the morning, according to his testimony, was made necessary because he ran out of flash bulbs before he had fully preserved the interior layout of the Oakes house on film. The eleven o'clock visit involved something by way of reconstruction of the position of the 22-410 rifle, and a search for an expended shell casing. The casing was located and its position recorded on film. Although the police had taken a cartridge belt, some firearms (including the 22-410 rifle) and some ammunition from the house when the respondent was taken to the police station, they brought it back at eleven the next morning for investigative purposes. On that basis, the respondent included those items in his motion to suppress, and similarly objected to their admission at trial.

The respondent takes the position that the permissible investigation at the scene of the crime ended when the police left the premises in the early hours of May 27. He objects to the six o'clock visit as unlawful and unauthorized, and attacks the

search warrant justification for the second visit as totally defective and invalid. The preliminary hearing denied his motion to suppress, and, likewise, the challenged exhibits were admitted on trial in the face of these same objections.

It is conceded that the original entry by the police of the Oakes home was lawful and at the request of the respondent. The issue is whether this right terminated at some point in the twelve-hour period between the initial response and either the six o'clock or the eleven o'clock return on the following morning. Since we start with the premise that the original entry was legal, the ensuing knowledge on the part of the police that a shooting had occurred derives from a constitutional rather than an unconstitutional entry, unlike *Wong Sun* v. *U.S.*, 371 U.S. 471 (1963), cited by the respondent.

■ The concern of the exclusionary rules relating to warrantless searches and searches incident to arrest center on the proposition that enforcement officers may not embark on groundless invasions of the person or premises and justify them by the fruits obtained. The requirement is that such incursions must be supported, before the fact, by information meeting the standards of probable cause. *Peters* v. *N.Y.*, 392 U.S. 40, 66–67, 20 L.Ed.2d 917, 936, 88 S.Ct. 1912 (1968).

The effect of permitted entry on this issue is developed in *Recznik* v. *City of Lorain*, 393 U.S. 166, 21 L.Ed.2d 317, 89 S.Ct. 342 (1968). In that case, by a *per curiam* opinion, the Supreme Court reversed a conviction on the basis that the probable cause for making the entry without a warrant leading to the arrest was inadequate. However, the dissent by Mr. Justice Black, joined by Mr. Justice Harlan, turns on a contrary view of the facts, rather than the law. It is their view that the original entrance was by invitation. That being so, the whole basis for invalidating the arrest and subsequent search and seizure is removed. This is basic constitutional law. See *Frazier* v. *Cupp*, 394 U.S. 731, 740, 22 L.Ed.2d 684, 693, 89 S.Ct. 1420 (1969).

■ It is also the situation in this case. The police came to the Oakes home at his request. This was not only the place where he was ultimately taken into custody, but also the very scene of the homicide charged here as criminal. The police did not have to make any preliminary justification by way of

probable cause in order to validate an entry against the will of the occupant, their presence was actively sought. The officers were confronted with the body of Mrs. Oakes and circumstances making it their duty to conduct an investigation on the premises. This, of itself, justified the search and the taking into possession of the related instrumentalities there present. With guns and small children present alongside a hysterical father, the "exigencies" referred to in *Warden* v. *Hayden*, 387 U.S. 294, 298, 18 L.Ed.2d 782, 787, 87 S.Ct. 1642 (1967), were certainly at hand.

Probably the fact that the respondent was taken into custody on the premises did not enlarge the investigatory authority of the officers, in view of *Chimel* v. *California*, 395 U.S. 752, 23 L.Ed.2d 685, 89 S.Ct. 2034 (1969), and *Vale* v. *Louisiana*, 399 U.S. 30, 26 L.Ed.2d 409, 90 S.Ct. 1969 (1970). Nevertheless, it certainly gave the situation an additional dimension, and the taking of the guns and ammunition a strengthened footing. Moreover, to repeat, the concern of *Chimel*, of *Vale*, and of *Warden* v. *Hayden*, *supra*, is that the privacy of domain ought not to be invaded by operation of law unless the need is weighed by the objective mind of a magistrate. *Chimel* v. *California*, *supra*, 395 U.S. at 761, 23 L.Ed.2d at 693. But this concern is based upon the lack of consent referred to in *Vale* v. *Louisiana*, *supra*, 26 L.Ed.2d at 413–14, 90 S.Ct. 1969. Here the enforcement officers were legally on the premises and the information they obtained validly acquired and properly admissible. See *Zap* v. *U.S.*, 328 U.S. 624, 629, 90 L.Ed. 1477, 1482, 66 S.Ct. 1277 (1946). The evidence involved in this suppression hearing was again challenged on the same ground at the trial, and its reception was proper at that time, also, for the reasons now advanced. .

■ The fact that the investigation was interrupted about one o'clock in the morning, the premises locked up, and then resumed about six o'clock the same morning, we do not find unreasonable or requiring renewed authority. The investigation was, for practical purposes, continuous and sequential. It was routine, involving measurements, picture taking and a search of the floor for the expended shell casing (which was found). There was no rummaging for secreted objects or

support sought for charges unconnected with the shooting. Prior to eleven o'clock on that same morning a search warrant was obtained, which, in view of the promptness of the investigation, was a gratuitous precaution. If it was somehow defective or deficient, its shortcomings are of no moment in this case.

It has already been noted that this investigation was taking place at the scene of the homicide. The role of the police officer carries with it the duty and responsibility to carry out such an investigation upon the discovery of what appears to be a crime. Once authorizedly on the scene, enforcement officers are under a duty to complete their investigation of the occurrence. Here, even if their original entry had been obstructed rather than solicited, the emergency situation called to their attention would have justified a warrantless entry and investigation of the scene as a part of their authorized duty. *United States* v. *Barone,* 330 F.2d 543, 545 (2nd Cir. 1964), cert. denied 377 U.S. 1004, 12 L.Ed.2d 1053, 84 S.Ct. 1940 (1964) ; *State* v. *Sutton,* 454 S.W.2d 481, 484-6 (Mo. 1970).

The discontinuity of the investigation was, in some measure, due to the limitations implicit in police work in most Vermont villages. The small manpower of the local force must, of necessity, be supplemented by the personnel and the expertise the state police can furnish, once they arrive. Likewise, the prosecutor must usually be called to the scene from some other part of the county. Delay, or interruption of police presence at the premises, on this account, does not undercut the right of the police to complete, within a reasonable time, their investigative work, or require a renewed authority to enter. *Stevens* v. *State,* 443 P.2d 600, 602-03 (Alaska 1968). Here, all was done in much less than twenty-four hours from the initial call for help. In a different case, an unwarranted prolongation of access to the property might require a different result. See the dissent of Roberts, J., in *Commonwealth* v. *Wegrzyniak,* 441 Pa. 249, 272 A.2d 167, 168 (1971). But here suppression was properly denied.

Moreover, having in mind that the defense in this case was predicated, alternatively, on accident or mental irresponsibility, the matters evidencing the shooting and identifying the gun were issues not in controversy. The shooting episode was not denied. Therefore, even if some error can be discovered

in connection with evidence offered in proof of these issues, it would be harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967).

Parallel conclusions were reached in the case of *State* v. *Gosser,* 50 N.J. 438, 236 A.2d 377 (1967). Factually, that case is remarkably like this one, with much identity of issues. There, the husband shot his wife upstairs rather than in the kitchen, called a friend for help, who notified police, and, upon their arrival, the husband admitted them to the house. In response to the initial question as to what the trouble was, he told the officers he had killed his wife. The description of the husband's unsolicited remarks and statements follow the present case closely. The gun was located and confiscated and the expended shell casing found on the floor. This does not exhaust the similarities, but sufficiently demonstrates them for our purposes. The New Jersey Supreme Court dealt with the questions raised in an able *per curiam* opinion to which we will have occasion to refer from time to time in this opinion.

Before moving on to evidentiary questions, there are claims of prejudice, on the *voir dire* examination of prospective jurors and on the opening statement, raised by the respondent. It is his position that the state's attorney, by the questions put to jurors, implanted prejudicial notions about the law and the evidence in the minds of these people.

In this state it is the practice to permit counsel to examine prospective jurors directly. This imposes upon them an obligation not to overreach the bounds of permissible questioning, since they are undertaking an office that may be assumed by the trial court, and are held to the responsibilities of officers of the court. The trial court is likewise bound to oversee this examination and avoid having the panel fatally infected with prejudice before the proceedings have fairly begun. Further, it is the duty of opposing counsel to call to the court's attention any claimed prejudicial conduct so that it may be corrected, and preserve his complaint by challenge to the array or for cause, if justified. Here no persisting challenge to the jury was maintained, the respondent acknowledged himself content with the ultimate jury, and called for no corrective action from the trial court. This is enough to set aside his objections raised here for the first time. But, this

being a serious case, we have taken the added step of examining the *voir dire* for prejudice to the respondent and find it is not made out. It is, perhaps, worth a word of caution to over-zealous counsel, however, to remind them that improper advocacy here can render the proceedings defective from the beginning. Here, no abuse has been shown. *Parker* v. *Hoefer*, 118 Vt. 1, 5, 100 A.2d 434 (1953).

■ Turning to the opening statement of the state's attorney, we have likewise examined it for prejudicial matter in the absence of any timely objection, and find none. As is pointed out in *Frazier* v. *Cupp, supra,* 394 U.S. at 736, 22 L.Ed.2d at 691, it is possible that some remarks could amount to prejudicial error, but this does not mean that every variance between the advance description and the actual presentation of the case constitutes reversible error. The jury was fully instructed that arguments and remarks of counsel were not in evidence, and that they were to take their law from the court. With these directions given and no prejudice having been shown, no error in this particular is made out.

■ *Miranda* v. *Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), requires that a full and precise advising of an accused as to his rights take place before any statements taken during in-custody interrogation can be admitted. This proscription does not apply to general on-the-scene questioning or to volunteered statements not the product of custodial interrogation. In this case, the officer's inquiry as to the reason for the respondent's call for assistance was answered by a statement of the respondent that he had shot his wife with a 22-410 rifle. At that point the officers present did not know that the woman on the floor had been shot, or that she was dead, or that anything other than a misadventure of some kind had taken place. This statement was admissible. *State* v. *Gosser, supra,* 236 A.2d at 381. Other than being asked, at the outset, who the woman on the floor was, and her name and date and place of birth, no interrogation of any kind was carried on at the Oakes house. All of the statements of the respondent offered and received in evidence were volunteered outbursts and unsolicited statements. Moreover,

although no complete *Miranda* warning was given in the first instance, the respondent was immediately informed that he did not have to speak at all. The rule of *Miranda* does not exclude testimony as to what he volunteered at the scene, and the evidence was properly admitted. *State* v. *Gosser, supra,* 236 A.2d at 381.

Certain photographic evidence of the interior and exterior of the Oakes home and of the blanket covered body and head wound of Mrs. Oakes were admitted in evidence. The respondent challenges their admission as being inflammatory and without foundation. Our examination of the record shows that they were authenticated and offered in connection with the testimony of various witnesses. The relevance of the pictures was established, and the propriety of the admission of the photographs was a question for the discretion of the trial court. *Killary* v. *Chamber of Commerce,* 123 Vt. 256, 269, 186 A.2d 170 (1962). We have examined the exhibits illustrative of the cause of death, and do not find them so inflammatory as to overbear their relevance and require their rejection as prejudicial as a matter of law. *State* v. *Frotten,* 114 Vt. 410, 417, 46 A.2d 921 (1946) ; *State* v. *Gosser, supra,* 236 A.2d at 382.

The two officers originally at the scene both testified that it was their opinion that the respondent was intoxicated when they arrived. Their recitation of the symptoms they observed was confirmed by the testimony of the first doctor on the scene. The respondent objects to this testimony of intoxication as being without foundation. The transcript of the testimony shows otherwise and the admission of this evidence was proper. The ruling of the trial court on this issue will not be disturbed.

Having in mind that the unrefuted statements of the respondent evidenced in the case identified the victim and verified the cause of her death as being a shot from the 22-410 rifle, a number of the respondent's objections to claimed deficiencies in foundation for certain testimony or to claimed outrunning of expertise on the part of certain witnesses became, at best, harmless error. As to them, respondent has not, and under the facts, could not show prejudice, and we are

not required to deal with them further. *State* v. *Gravelle,* 117 Vt. 238, 244, 89 A.2d 111 (1952).

■ The respondent did object to the testimony of the attending doctor, who, in response to questioning, revealed that he had treated the respondent about a year previously for "excess alcohol intake and combativeness and hostility and difficulty at home." The objection was sustained, but the respondent argues the issue here. Having in mind that the objection was that such testimony lacked foundation and was, at that time, irrelevant and immaterial, we would note that the doctor, as a convenience, was being permitted to testify out of time. These issues were relevant and material, and a ruling in favor of their admissibility could be supported. The respondent can not now be heard on a ruling that was not only not prejudicial but favorable to him. *State* v. *Wood,* 121 Vt. 49, 51, 147 A.2d 678 (1959).

■ Several witnesses testified to various threats made by the respondent to kill himself, his wife or his children. The earliest of these statements went back several years, while other statements related to threats made a little more than a year previous to the shooting. Evidence of such threats are admissible on the issue of malice. *State* v. *Lizotte,* 109 Vt. 378, 383, 197 A. 396 (1938). That some of these threats may be remote goes to their weight, not their competency, *State* v. *Averill,* 85 Vt. 115, 122, 81 A. 416 (1911), particularly where they have been repeated over a period of time approaching the present. The rulings of the trial court admitting this evidence are sustained. 1 Wigmore, Evidence § 108 (3d ed. 1940).

■ The examining psychiatrist, on direct examination, was asked about what the respondent had told him of his drinking habits. The answer was taken over the objection of the respondent. Although no grounds were advanced at the time of the objection, in his brief the respondent argues that this inquiry violated a physician-patient confidence, was solicited from the doctor as an agent of the State and therefore should have been excluded unless shown to have been prefaced by the *Miranda* warnings, and violated the requirements of *State* v. *Miner, supra,* 128 Vt. 55, 258 A.2d 815. As can be seen these objections are not entirely consistent. Since the

examination was for the purpose of enabling the doctor to give evidence as to the respondent's sanity, and conducted at the instance of the State, application of the physician-patient relationship is inappropriate.

The strictness of the *Miner* case and the *Miranda* rule are similar in their purpose. Incriminating facts or statements are not to be extracted from the respondent and used to establish his guilt without forewarning or against his will. *State* v. *Miner, supra,* 258 A.2d at 824. In the case of the psychiatric examination the prohibition is intended to operate to insure maximum disclosure to the examining doctor in order to implement the fullest possible evaluation for the benefit of the respondent and the State. Thus the concern is, in a sense, broader than the ordinary application of the *Miranda* rule.

However, in the case at hand, the elicited facts were not incriminating and did not tend to establish, in any way, the truth or falsity of the charge laid against the respondent. On the other hand, these facts were essential ingredients in the full evaluation of the issue of the respondent's sanity, or lack of it. Moreover, as the evidence on behalf of the respondent came into the case, the relevance of this testimony on that issue became even more pronounced. The psychiatrist testifying on behalf of the respondent related his mental responsibility, or lack of it, from time to time, to the after-effects of drinking episodes. The reception of the testimony challenged was not error. 13 V.S.A. § 4823.

With evidence before the jury on the essential elements of the crime charged, the issues were properly for their evaluation. To direct a verdict in such circumstances would have been improper. *State* v. *Ballou,* 127 Vt. 1, 7, 238 A.2d 658 (1968).

Previously, it was the rule that objections to improper argument would not be considered in this Court unless the argument objected to was put into the record. *State* v. *Gravelle,* 117 Vt. 238, 245, 89 A.2d 111 (1952). This Court has since required that the arguments be transcribed, so that stating the objectionable language is no longer necessary.

*State* v. *Shuttle*, 126 Vt. 379, 382, 230 A.2d 794 (1967). But as the *Gravelle* case points out, there is also an obligation to make known to the trial court the ground of the objection so that that court may know what it is to rule upon, or what corrective action is required. Here, the arguments complained of in the brief as unjustified or inflammatory were not objected to at the trial. To have the benefit of such a complaint here, an opportunity must have been given the trial court to take corrective action, or in the alternative, there must be a showing that no such opportunity was offered. *State* v. *Baril*, 127 Vt. 394, 399, 250 A.2d 732 (1969). Moreover, an examination of the arguments here demonstrates that they did not exceed the bounds of fair comment, and furnish no ground for reversal.

 The respondent is critical of the charge in several particulars. He faults the explanation of the court that limited the burden of proof beyond a reasonable doubt to the essential elements of the crime charged, rather than pertaining to each incriminating fact. This is a correct statement of our law, clearly explained by the court, and not error. *State* v. *Green*, 126 Vt. 311, 313, 228 A.2d 792 (1967).

 The respondent also complains that the court was not justified in referring to marital discord in its charge, claiming there was no such evidence in the case. It is a sufficient answer to say that such evidence does appear in the testimony of more than one witness, and adequately supports the reference by the trial court.

Since the defense was, in part, based on a claim of accident, the respondent took exception to the statement of the court that there is no presumption that a shooting was accidental. This concept is closely connected to proof of the element of malice, which was also the subject of an exception to the charge, so we will treat them together.

As the court pointed out in its charge, the State has the burden to establish beyond a reasonable doubt the essential elements of the crime charged, and the respondent does not have to prove anything. The court went further and pointed out that the respondent's claim of accident is a denial of criminal intent, but imposes no burden of proof as to this claim on the respondent. Such evidence is for consideration by the jury as to its persuasive weight to counter the prosecution's

evidence that the shooting was wilful and intentional. It may enlarge the burden of the State to convince the jury beyond a reasonable doubt of the wilfullness of the act, but that burden is not further magnified by any presumption to the effect that a killing is accidental. To that extent, with evidence that a killing is wilful is present in the case, a risk of non-persuasion may then fall upon the respondent, so that he neglects to put forward any evidence of accident at his peril. *State* v. *Coburn*, 122 Vt. 102, 109, 165 A.2d 349 (1960).

When the evidence established that the death of Mrs. Oakes came about through the use of a deadly weapon, it justified an inference that the killing was intentional, *State* v. *Marino*, 91 Vt. 237, 245, 99 A. 882 (1917), and supported a presumption of malice. *State* v. *McDonnell*, 32 Vt. 491, 539. Here, too, as the court pointed out the presumption can be rebutted by the introduction of evidence in justification. It is in fact dissipated and departs the scene if the opposing evidence is forthcoming. *Tyrrell* v. *Prudential Ins. Co.*, 109 Vt. 6, 23–24, 192 A. 184 (1937). Its operation is now to be distinguished from the continuing evidential effect of the presumption of innocence as now provided for in 13 V.S.A. § 6502. The charge of the court gave full weight to this statutory presumption, to the benefit of the respondent.

The charge of the court, on all counts, was full and fair to the respondent and to the state. None of the objections raised by the respondent to it demonstrates any error of law so prejudicial as to require reversal. *State* v. *Green, supra,* 126 Vt. at 313.

The respondent seasonably filed motions to set the verdict aside and to reduce the verdict to something less than murder in the first degree. Both motions were predicated on claimed shortages in the evidence with respect to malice and premeditation. Perhaps enough has been said to demonstrate the presence of evidence sufficient to require that these issues be left as the jury disposed of them. But even such matters as the location of the bullet wound beside the ear of Mrs. Oakes, and the course of the bullet, like other suggestive evidence properly admitted, contribute to the supportability of the jury's decision. See *State* v. *Bucanis*, 26 N.J. 45, 138 A.2d 739, 744 (1958).

The respondent also argues that his motion for a stay of execution pending appeal should have been granted. The discretion in this matter is given to the trial court by 13 V.S.A. § 7401, and this Court will not interject itself into its exercise without a demonstration of abuse. It has not been shown here.

*Judgment affirmed.*